JOHN ARBORIO, INC. *v.* WILLIAM J. COX, HIGHWAY COMMISSIONER

MALTBIE, C. J., BROWN, JENNINGS, ELLS and DICKENSON, JS.

Argued March 2—decided April 22, 1948

*James W. Carpenter*, with whom was *John Gilleran* of the New York bar, for the appellant (plaintiff).

*Thomas J. Conroy,* assistant attorney general, with whom, on the brief, was *William L. Hadden,* attorney general, for the appellee (defendant).

MALTBIE, C. J.  In this action the plaintiff corporation, which had made a contract with the state highway department to construct a section of the Wilbur Cross Parkway, seeks to recover additional compensation for certain work it did in excavating for a connecting road between the parkway and another highway, on the ground that the work was not within the scope of its contract, and for the making of a fill with "selected" rock, on the ground that it was not required by its contract to use that material. Permission to bring the action was granted by the General Assembly.  24 Spec. Laws 16.  The trial court rendered judgment for the defendant and the plaintiff has appealed.

The finding contains numerous paragraphs stating conclusions of law as to the obligations of the plaintiff which it claims to be erroneous; these are necessarily involved in the discussion which follows and we shall not refer to them specifically.  Assignments of error in the finding of facts and in the failure of the trial court to make other requested findings will, so far as material, be considered in connection with the issues to which they are relevant.

The contract on its title page is designated as "Town No. 185, Project No. 33," and it states that it is for the grading and drainage of a section of the Wilbur Cross Parkway in the towns of Hamden and North Haven "from Sta. 132 + 0 to Sta. 273 + 0," a length of 12,586.2 feet.  The parkway ran generally in an easterly and westerly direction and station 273 was at the easterly end of the portion in question.

The excavation which the plaintiff claims was not in the contract was made in the course of the construction of a temporary connection between the parkway and a highway known as the Old Hartford Turnpike. The connecting road started at about station 273 and ran a considerable distance to the east, curving away from the main line of the parkway. The contract provided that payment for work done under it should be made "at the unit prices bid by said Contractor for the respective estimated quantities and such other items as are contained in its original proposal," and attached to the contract was a "Schedule of Prices as quoted on the 'Proposal Form.'" When the plaintiff was directed to proceed to excavate for the road, it contended that the work was outside its contract, but finally performed it under protest. Its claim is that it was paid upon the basis of the price fixed in the schedule for "unclassified excavation," but that it was entitled to payment at a higher price because the excavation was almost wholly of rock.

The contract contains a provision that the contractor's "proposal together with the Standard Specifications, Form 805, are made a part of this Contract and accepted as such and also the plans of the work, prepared or approved by the State Highway Department, which plans as verified by said Department, are also agreed by each party as being a part hereof." In determining the scope of the work contracted to be done, it is necessary, therefore, to examine not only the contract but the specifications and plans made a part of it. The specifications contained a provision: "Any requirements appearing on either the plans, these specifications or the 'Special Provisions' shall be equally binding on the Contractor." There are a number of special provisions

attached to the contract but none are involved in this case.

The plans consisted of a large number of separate sheets. One of them, an "Index" map, and two others, covering a section of the highway beginning at station 265 and extending to station 278, designate station 273 as "End of Project." The "Index Map" has, however, a label, "Grade Temporary Connection," with an arrow pointing to a place beyond station 273. On one of the others the connection to the turnpike beginning at about station 273 and continuing to station 278 is plainly outlined, and there is a label, with an arrow pointing to the outline of the connection, stating, "Grade a temporary connection to Old Hartford Turnpike"; below it is the further direction, "Sta. 273 + 0 to Old Hartford Turnpike install 12″ Subbase as directed under temporary connection." The third plan, which contains details of the construction of a bridge over the turnpike at a point somewhat easterly of station 273, has a label, with arrows pointing to places beyond that station, which states: "Grade Temporary Connection to Old Hartford Turnpike." While it is true that the plans do include some work admittedly not within the scope of the plaintiff's undertaking, these clear references to and specific directions as to the grading of the connection indicate strongly that the contract was intended to include it.

This is definitely established by other evidence. Another sheet of the plans is headed "Detailed Estimate Sheet for the Construction of Grading and Drainage On A Section Of The Wilbur Cross Parkway . . . from Sta. 132 + 0 to Sta. 273 + 00, length 12,836.20 feet"; then below the last portion of this statement is a further entry, "Approaches to the Parkway 4226.39," and an addition of this figure

to the 12,836.20 feet designated above, making a total of 17,062.59 feet. Below this is a table headed "Excavation and Borrow," which gives the amount required for such work, "Sta. to Sta.," and beneath are four columns, one giving the station where the work was to begin, another where it was to end; a third is headed "Unclassified Excavation," and a fourth, "Earth Fill." In this table one item, entered in the first three columns, was "270 + 0 | 275 + 0 | 55777," and another, entered in all four columns, was "275 + 0 | 276 + 50 | 1509 | 12." The total of the column headed "Unclassified Excavation" is given as 429,248, and the total of that headed "Earth Fill" as 572,678; and these totals include the two items quoted above as regards both excavation and fill. The total amount of "unclassified excavation" given in this table exactly corresponds with the amount of "unclassified excavation" stated in the "Schedule of Prices" attached to the "Proposal Form" submitted by the plaintiff in its bid for the work, a copy of which is attached to and incorporated in the contract.

On September 29, 1941, the plaintiff wrote the defendant a letter in which it was suggested that the contract be changed so that "borrow," that is, material from outside the limits of the highway, should be used for the embankment to which we later refer. A sentence in this letter is in part as follows: "We were wondering if it would not be to our material advantage to use this borrow material instead of using the last cut on our contract between Sta. 270 + 00 to Sta. 276 + 50." Aside from the testimony of the plaintiff's vice-president, who wrote the letter, that the figures 276 + 50 were taken from the plans, we would assume this to be so. The figures are found on the "Detailed Estimate Sheet," which

includes the two items previously referred to: one, between stations 270 and 275, 55,777 cubic yards of excavation; and the other, between stations 275 and 276 + 50, 1509 cubic yards of excavation and 12 cubic yards of earth fill. It is an inescapable conclusion that the work upon the connecting road was within the contemplation of the plaintiff when it submitted its bid and within the scope of its contract.

That the designation of stations 132 and 273 was not intended definitely to mark the beginning and end of all work the plaintiff had contracted to perform is confirmed by these further facts: A sheet of the plans showing the beginning of the project calls for the installation at station 131 + 40 of a 24-inch A. C. C. M. pipe. On the sheet headed "Detailed Estimate" appears an item for a fill beginning at station 131 + 40 and extending to station 135, 47,170 cubic yards; and this item is included in the total amount of fill designated on the sheet as 453,309 cubic yards. On this sheet also appears an item for a 24-inch drainage pipe, designated as "A. C. C. M.," at station 131 +.75, with incidental work connected therewith, including 105 cubic yards of "Trench Excavation." On the "Schedule of Prices" in the plaintiff's proposal, which is incorporated into the contract, is an item for "240 linear feet of 24″ Asphalt Coated Corrugated Metal Pipe at Three Dollars and Sixty Cents per Lin. Ft." The plaintiff makes no claim that the work west of station 132 + 0 was not within the scope of its contract. It is also found, without any dispute as to the fact, that the plaintiff has performed work on other contracts with the defendant beyond the points designated as the beginning and end of the project without question or claim for damages. The designation of the project as between stations 132 and 273 evidently merely referred

to the section of the highway itself which was to be constructed under the contract, but the contract clearly included within its scope other incidental work immediately connected with that construction, though not between the designated stations. The plaintiff agreed to excavate for the connecting road on the basis that it was "unclassified excavation," defined in the specifications as including "any and all materials, other than water"; and it was paid upon that basis. The trial court was correct in its conclusion that the plaintiff was not entitled to any further compensation for the work done in excavating for and grading the roadway connecting the new highway with the old turnpike.

The other claim of the plaintiff arises out of this situation: The parkway was to cross a swampy tract of land which had muck and soft material to a depth of about three feet. It was necessary to build an embankment at this place. The plans called for the excavation of the swampy material before the embankment was constructed, but it was later decided not to excavate this material but to place the embankment on top of it. The claim of the plaintiff is that it was directed to use only "selected" rock for the fill, contrary to the terms of its contract, that when so directed it wrote the defendant that the making of the fill in this way was not within its contract and it would expect payment on the basis of a rock fill, and that the use of "selected" rock added very materially to the expense to which it was put in order to construct the embankment.

The specifications define excavation as consisting of the removal and satisfactory disposal of all material necessary for the construction of the roadbed, embankments and other work, and specifically as including the formation of embankments and the dis-

position of surplus or unsuitable material. They then proceed to classify excavation as "Earth," "Rock," "Loam" or "Unclassified." Rock excavation is then defined as including "boulders of ½ cubic yard, or more, in volume, and rock in definite ledge formation, the removal of which requires wedging, barring or the use of explosives, removed as indicated or directed." Unclassified excavation is defined as including any and all materials, other than water, removed as indicated or directed; and then the specifications proceed: "When no item of excavation other than unclassified appears on the proposal form, no compensation will be made under any of the other classifications given herein." The specifications further required that, unless specifically provided elsewhere in them, all suitable material removed from the excavation should be used in the formation of embankments, subgrade, shoulders, etc., and at such other places as might be required. In another paragraph they directed that embankments should be constructed "of earth or a mixture of earth and rock, deposited in successive layers for the full width of the embankment," the depth of each layer with certain exceptions to be not more than twelve inches, and to be leveled and compacted.

The plaintiff was engaged in making a rock cut through sandstone, as required by its contract. The top soil had been removed down to the rock, and this had to be blasted. The sandstone was soft and easily pulverized. The plaintiff makes no claim that the defendant's engineer did not have the right to instruct it to use the material from the cut just as it was excavated. Its contention is that the direction to use only "selected" rock meant that it had to select and use the larger pieces, free of any small fragments, earth or dust. The court found that it

was not directed to use only selected rock, and there is direct testimony to support that finding. The plaintiff, however, relies largely upon a letter it received from the defendant's engineer ordering it to use "rock from your rock cuts which now exist on your job," and a memorandum from the engineer to the inspector on the job which was shown to, and a copy of which was made by, a representative of the plaintiff and which directed the inspector to see to it "that, as per my letter of a few days ago to Mr. Arborio, no other material other than rock is placed across the swamp land between Dixwell Avenue and the American Mills."

The reference in the definition of "rock excavation" to "boulders of $\frac{1}{2}$ cubic yard, or more, in volume" furnishes the basis for distinguishing rock excavation from other excavation, no doubt for the purpose of determining compensation to be paid a contractor, and is not a specification of the sizes of rock or rock fragments to be used for fill. The specifications nowhere define the word "rock" as used in the directions for making embankments, or require that the pieces be of any special size, or preclude the use of small pieces or even of pulverized material resulting from blasting or handling. The letter from the engineer to the plaintiff directing that the material for filling the swamp should be taken from the rock cuts on the job was in answer to one from the plaintiff in which it had suggested the use for the fill of sand and gravel to be secured from a plot of ground outside the right of way. Read in the light of this fact, the instruction to use "rock from your rock cuts which now exist on your job" certainly fell short of an explicit requirement that the plaintiff "select" the large pieces from that excavation. The memorandum from the engineer to

the inspector containing the statement that no other material than rock should be used for the fill had first referred to permission granted the plaintiff to use an additional amount of "borrow," and requested the inspector to see that the amount allowed was not exceeded. The memorandum, read in the light of the reference to the letter written by the engineer to the plaintiff and of the context in which the sentence in question is used, makes it clear that it added nothing to the direction in the letter. The evident purport of both the letter and the memorandum was that the fill should be made, not with "borrow," but, as stated in the specifications we have quoted, suitable material removed from the rock cuts. If the trial court intended, by its finding that no direction to "select" rock for the fill was given the plaintiff, to include not merely oral directions but an interpretation of the letter and memorandum, its conclusion finds support in the statements of two engineers testifying as experts that "rock fill" used in such circumstances as were present in this case meant all material resulting from the blasting of a rock formation, including small pieces, loose earth and the like. We can find no error in the conclusion of the trial court that the plaintiff was not directed, as it claimed, to use only "selected" rock.

It only remains to point out that the trial court has found that the plaintiff did not in fact use only "selected" rock for the fill and that any selection it made was for its own convenience, by which the court evidently meant that the plaintiff could make advantageous use of the types of trucks it was employing, one adapted to handle the larger pieces and the other to transport smaller pieces and debris; and that these findings find adequate support in the evidence. The trial court correctly concluded that the plaintiff was

not entitled to additional compensation on account of the construction of the embankment.

There is no error.

In this opinion the other judges concurred.